John G. Crist
Crist, Krogh & Nord, LLC
2708 First Avenue North, Suite 300
Billings, MT  59101
Telephone No.:  (406) 255-0400
Facsimile No.: (406) 255-0697
Email:  jcrist@cristlaw.com

Robert L. Jovick
Attorney at Law
P.O. Box 1245
Livingston, MT  59047
Telephone No.: (406) 222-3065
Email:  leagle@imt.net

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BILLINGS DIVISION

| | | |
|---|---|---|
| PETER and ILZE THOMPSON, | ) | |
| | ) | Case No. CV-10-27-BLG-RFC |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| DAVID COULTER, SUSAN | ) | **DEFENDANTS'** |
| COULTER WEEKS, d/b/a | ) | **MEMORANDUM IN** |
| THE CW BAR RANCH, | ) | **SUPPORT OF SECOND** |
| a Montana Partnership, | ) | **MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| Defendants. | ) | |

# I. INTRODUCTION

Peter Thompson filed his original Complaint on February 25, 2009. Docket #1, Exhibit "A". An Amended Complaint was later filed in which Peter Thompson alleged seven common law claims[1] and a claim for violation of Montana's Wrongful Discharge from Employment Act ("WDEA"). Docket #1.

Peter's spouse, Ilze Thompson, was named as a plaintiff in the Amended Complaint. Id. She asserted a claim for breach of contract claim (Count One) and breach of promise (Count Eight), alleging she was a third-party beneficiary to Peter's employment contract. Id. No claim was made on Ilze Thompson's behalf for Intentional Infliction of Emotional Distress (Count Seven). That Count specifically refers to "Plaintiff", not "Plaintiffs", and makes no mention of Ilze Thompson.

Prior to conducting any discovery, the Defendants filed an early Motion for Summary Judgment (Docket #3), a Memorandum in Support (Docket # 4), and a Statement of Uncontroverted Facts (Docket #6). After the Motion was fully briefed, the Court dismissed several of Peter Thompson's claims, but denied the

---

[1] The claims are: (1) breach of contract; (2) fraud in the inducement; (3) negligent misrepresentation; (4) negligence; (5) actual malice; (6) intentional infliction of emotional distress/breach of fiduciary duty, and (7) breach of promise.

Motion as to his claim under the WDEA (Count Six), Intentional Infliction of Emotional Distress (Count Seven) given the state of the record at that early stage of the proceedings. (Docket #24). Opinion at 9-12. It also dismissed the Punitive Damages Claim (Count Five), except with respect to Count Seven. Opinion at 10.

With respect to Ilze Thompson, the Court noted in Footnote #1 that she claimed to be a third-party beneficiary of Peter's employment contract (Opinion at p. 1). It dismissed both the breach of contract claim (Count One) and the breach of promise claims (Count Eight), effectively dismissing the third-party beneficiary claims she asserted. The Court did not otherwise discuss or address her claims. Despite the fact it was not pled, it is Plaintiffs' position that Ilze Thompson has a claim in this case for emotional distress damages as a result of her husband's termination.

Since the Court's ruling, the parties have conducted significant discovery including depositions of all principle parties. Based on the undisputed facts learned in discovery, Defendants have renewed their Motion of Summary Judgment as to the remaining two claims.

## II.  **SUMMARY OF ARGUMENT**

The Montana Wrongful Discharge from Employment Act ("WDEA") is a terminated employee's exclusive remedy for damages arising from the discharge. Mont. Code Ann. § 39-2-913.  A plaintiff cannot seek damages for emotional distress caused by the wrongful discharge.  Mont. Code Ann. § 39-2-905(3).

At the time of Defendant's first Motion for Summary Judgment, the parties had done no discovery concerning the cause of Peter Thompson's alleged emotional distress.  Since then, both Peter Thompson and his expert witness counselor admit that Thompson's emotional distress arose from and was caused by his "abrupt termination" (to use his counselor's words).  Thompson even admits his distress would not have occurred "but for" the termination.  Since they admit the emotional distress was caused by the termination, this claim is inextricably intertwined with the WDEA claim.  By statute, no damages may be awarded for emotional distress caused by a termination, and the claim must be dismissed.

As to Ilze Thompson, no claim for emotional distress was pled.  Even if pled, however, the WDEA does not allow, and Montana has never recognized, a claim for emotional distress caused to the spouse of a terminated employee which arose from the termination.

Peter Thompson's claim under the WDEA is barred by the one-year statute of limitations. Under Montana law, Thompson's WDEA claim accrued when Defendants stopped paying him for work, severing the employee/employer relationship. All of the elements of his claim, including damages, existed at that time.

In response to Defendants' first Motion for Summary Judgment, and before any discovery had been done, Peter Thompson claimed he was still working and being compensated for working through the end of February 2008. In fact, this is not true.

It is undisputed -- and Thompson now admits -- that Defendants last paid him for any work for the pay period ending January 31, 2008. At that time, he received his last wages and got a "Closing Bonus". The last time record he submitted was for January 31, 2008. Thompson did not turn in any time records seeking pay for February 2008 and he received no pay for February of 2008.

Thompson had to file his claim by February 1, 2009 to comply with the one-year statute of limitations. He did not file until February 25, 2009. Based on the records and Thompson's admissions, no material facts exist from which a reasonable jury could conclude his claim was timely filed.

## III.   FACTS

### A.   Facts Relevant to Emotional Distress Claim.

Peter and Ilze Thompson have submitted an Expert Witness Disclosure from Kathleen Cullen-Mielnik, a licensed clinical professional counselor. SUF, ¶ 1. [2] In her written report, Ms. Cullen-Mielnik states that:

> As a result of his [Peter's] abrupt termination the parties have experienced severe distress including serious financial difficulties, marital and family distress and tension, health difficulties resulting from the stress and resulting emotional distress.

(Emphasis added).  In her deposition, she confirmed that this statement accurately summarized her opinion as to the distress the Thompsons were experiencing and that the termination caused that distress. SUF, ¶ 2.

Peter Thompson confirmed in his deposition that Ms. Cullen-Mielnik's statement concerning the cause and nature of his emotional distress was accurate. He further confirmed that he would not have experienced any of the types of emotional distress described by Ms. Cullen-Mielnik but for the fact he was terminated. SUF, ¶ 3.

---

[2] All references are to Defendants' Statement of Undisputed Facts, filed in support of this Second Motion for Summary Judgment.

Ilze Thompson also confirmed in her deposition that Ms. Cullen-Mielnik's statement concerning the cause and nature of both her distress and her husband's emotional distress was accurate. SUF, ¶ 4.

## B. Facts Relevant to Statute of Limitations Issue.

Plaintiff Peter Thompson began working on the CW Bar Ranch on or about July 15, 2004. SUF, ¶ 5.

In late September of 2007, Thompson and Susan Coulter had a conversation. Thompson contends that, during that conversation, she advised him that she was replacing him within three months time. SUF, ¶ 6. After this conversation, Thompson assisted the Coulters in hiring his replacement by preparing interview questions and a ranking of the applicants for his position. SUF, ¶ 7.

On November 28, 2007 Thompson sent David Coulter an email requesting that he be allowed to remain employed for two more months. David Coulter responded that working in January was fine, but they would have to discuss February with Susan. SUF, ¶ 8.

In 2008, the Ayco Company performed certain accounting services for the Coulters, including the processing of pay checks for Peter Thompson. On January 2, 2008, Susan Coulter contacted Ayco by email and stated, with respect to Thompson, "We need to come up with a figure for a Thank You and Goodbye

payment for month end". SUF, ¶ 9. A few days later, on January 7, 2008, Susan

inquired of Ayco whether it was appropriate to pay Thompson a "cash gift" for his

"final payment". She was told it was not advisable. SUF, ¶ 10.

On January 25, 2007, Susan Coulter sent her accountant an email stating that

"Peter's last day is January 31st." She also stated Peter "would be happy to

continue thru the end of Feb", but that his replacement was "more than set to go".

SUF, ¶ 11.

Consistent with that email, on January 31, 2008, Susan Coulter spoke to

Thompson. She advised him that he did not have to "come in next month". She

said Thompson would get pay for February 2008, but he did "not have to come out

to the ranch". SUF, ¶ 12.

On February 1, 2008, Susan Coulter contacted her accountant to confirm

that Thompson had been wired "TWO transfers – one for month end, one

severance, right?" SUF, ¶ 13. In an email exchange with her accountant, Susan's

accountant asked, "What would you like us to title the second payment (bonus,

closing bonus, severance payment)?" She told the accountant that the second

payment to Peter Thompson was a "Closing Bonus." SUF, ¶ 14.

Thompson's last pay check was deposited in his account on February 4,

2008. As set forth on the pay stub, the last pay period on this last check was

"01/18/2008 – 01/31/2008".  He also received a "Closing Bonus" of $6,250.00. SUF, ¶ 15.

Thompson's gross YTD (year to date) pay as stated on his February 4, 2008 pay stub was $14,290.91.  Thompson's 2008 W-2 from the Defendants states his total gross pay for all of 2008 was $14,290.91.  SUF, ¶ 16.  Thus, the pay he received for work ending on January 31, 2008 was the last pay he ever received from the Coulters.  Thompson admitted that the last pay that he received from the Defendants was the salary and closing bonus he received for the pay period ending January 31, 2008.  SUF, ¶ 17.

During his employment with the Defendants, Thompson routinely submitted time records to Ayco which were used by Ayco to process his paychecks.  The last date for which Thompson submitted any time record was for January 31, 2008. The email with which he transmitted the January 31, 2008 time card included a note to Corrine Gileski, one of the Ayco accountants, stating, "It has been a great pleasure working with you".  SUF, ¶ 19.

Thompson did not submit any time records for any work in February of 2008.  SUF, ¶ 20.  Likewise, Thompson did not go out to the CW Bar Ranch at all in February of 2008.  SUF, ¶ 18.

Thompson completed an on-line application to seek unemployment compensation from the Unemployment Division of the Montana Department of Labor & Industry. The State of Montana sent Ayco a Notice of Potential Benefit Charge from the Unemployment Division of the Montana Department of Labor & Industry concerning Thompson. That Notice contained the statement, "The claimant states they were employed with your firm for 07/15/2004 to 2/20/2008 and separated from employment because of a voluntary quit or discharge". SUF, ¶ 21. Shortly thereafter, Thompson completed a Claimant's Separation Statement in connection with his unemployment compensation claim. Consistent with the Notice, it stated that his "End Date" was 02/20/2008. SUF, ¶ 22.

## IV.   DISCUSSION

Defendants, as the moving party, have the burden to present evidence by way of affidavit or appropriate proof that there is no genuine issue as to any material fact and that it is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Cattrett, 477 U.S. 317, 324 (1986). Once done, Thompson must "set forth specific facts showing that there is a genuine issue for trial." Kaiser Cement Corp. v. Fischbach & Moore, Inc., 793 F.2d 1100, 1103-04 (9th Cir. 1986), cert. denied, 479 U.S. 949 (1986). He cannot rely on mere allegations in his complaint; rather, he must provide specific facts by affidavit or

other appropriate means to establish there is a material dispute of fact. Fed.R.Civ.P. 56(e)(2).

**A.**   **Peter Thompson's Claim for Emotional Distress and Punitive Damages Must be Dismissed, Because a Discharged Employee Cannot Seek Damages for Emotional Distress Caused by the Discharge.**

The WDEA provides the exclusive remedy in Montana for damages arising from wrongful discharge from employment. Mont. Code Ann. § 39-2-913. No damages can be awarded for wrongful discharge for, among other things, "emotional distress". Mont. Code Ann. §39-2-905(3); <u>Kulm v. Montana State University Bozeman,</u> (1997), 285 Mont. 328, 331, 948 P.2d 343, 245.

In discovery, Defendants sought information concerning Thompson's claim for emotional distress. Thompson's expert could not have been any clearer. Her report states that the emotional distress experienced by Peter and Ilze Thompson was caused "as a result of his [Peter's] abrupt termination". She confirmed this opinion in her deposition.

Peter Thompson was equally clear. He agreed with his expert's conclusion and even confirmed that, but for the termination, he would not have experienced the emotional distress described by his expert witness.

The WDEA expressly precludes an award of damages for emotional distress caused by the discharge. Mont. Code Ann. § 39-2-913. This Court reached

precisely that conclusion in <u>Rasmussen v. Best Buy Stores, LP</u>, Cause No. CV 06-159-BLG-RFC (attached hereto). There, Plaintiff made a claim of negligent infliction of emotional distress. Citing the WDEA and <u>Kulm,</u> the Court held the claim must be dismissed, because her distress arose from and was caused by the loss of her job. Opinion at 18.

There are rare circumstances when a common law claim may be asserted in addition to a WDEA claim. <u>Beasley v. Semitool, Inc.</u> (1993), 258 Mont. 258, 853 P.2d 84 (where claim is separate and distinct from the WDEA claim). Such is not the case here. Both Thompson and his expert assert that the distress was caused by the termination and that but for the termination, Thompson concedes he would not have experienced any distress.

> Q:   I take it it's your contention you wouldn't have experienced any of the types of distress described by Ms. Cullen, but for the fact that you were terminated; is that your position?
>
> A:   Yes.

SUF ¶ 3. Where the distress was caused by the alleged wrongful termination, and would not have occurred, but for the alleged termination, the claim is inextricably intertwined with the discharge and no common law claim may be separately pursued. <u>Rasmussen v. Best Buy</u>, Order at 18; <u>Kulm</u>, 285 Mont. at 331-33, 948 P.2d at 245-46. In the instant case, both the Plaintiff and his expert state plainly

that the emotional distress was caused by Peter Thompson's "abrupt termination". Since the alleged distress was caused by the termination, and no damages may be awarded for emotional distress caused by a termination, Peter Thompson's claim is barred by statute and should be dismissed.

Finally, the claim for Intentional Infliction of Emotional Distress (Count Seven) is the only claim that could potentially support a claim for punitive damages (Count Five). Punitive damages are not available under the WDEA, except in circumstances not at issue in this case. Mont. Code Ann. § 39-2-905(3). Thus, the claim for punitive damages in Count Five must also be dismissed.

**B.**   **Ilze Thompson's Claim for Emotional Distress Must be Dismissed, Because No Such Claim Exists Under Montana Law.**

Ilze Thompson did not plead a claim for intentional infliction of emotional distress. No fair reading on Count Seven contains a claim by Ilze Thompson.

Apart from the fact it was not pled, the WDEA does not authorize the spouse of a terminated person to bring a claim for intentional infliction of emotional distress caused by a spouse's termination. "Except as provided in 39-2-912, this part [the WDEA] provides the exclusive remedy for a wrongful discharge from employment". Mont. Code Ann. § 39-2-902. None of the exceptions on § 39-2-912 allow a separate claim for a spouse for emotional distress damages. In fact, the WDEA explicitly states that there is "no right <u>under any legal theory</u> to

damages for wrongful discharge under this part for . . . emotional distress . . .". §

39-2-905(3). While it is debatable whether the Legislature even conceived of the

possibility that a spouse might assert a claim for emotional distress caused by a

discharge, the broad limiting language of the statue precludes such a claim.

To the extent one can draw upon the personal injury context for guidance,

Montana has never gone so far as to recognize what used to be called a "bystander"

claim in this context. [3] Even in the negligence context, a claim made by one who

is not the object of the defendant's alleged bad conduct has been limited to persons

who witness the death of or severe injury to a family member, arrive promptly

upon the scene of an accident which severely injures a family member, or in the

context of a mishandling of a dead body. Wages v. First Nat. Ins. Co. of America,

2003 MT 309, ¶¶13-14, 318 Mont. 232, 79 P. 3d 1095 (injury); Nelson v.

Hawkins, 45 F. Supp 2d 1015 (D. Mont. 1999) (death) Contreraz v. Michelotti-

Sawyers (1995), 271 Mont. 300, 896 P. 2d 1118 (mishandling of dead body). Such

a claim has not and should not become the standard in every wrongful discharge

case.

---

[3] The Montana Supreme Court has dispensed with the "bystander" analysis
first recognized in Versland v. Caron Transport (1983), 206 Mont. 313, 671 P. 2d
583. See discussion in Wages v. First Nat. Ins. Co. of America, 2003 MT 309,
¶¶13-14, 318 Mont. 232, 79 P. 3d 1095.

If the Court allows Ilze Thompson to pursue a claim she never pled, it should still hold she cannot state a claim for intentional infliction of emotional distress in the context of her husband's wrongful discharge.

## C.   Thompson's WDEA Claim is Barred By The One-Year Statute of Limitations.

### 1.   Thompson's Claim Accrued on January 31, 2008 When He Stopped Receiving Pay for Working.

A claim for violation of the WDEA must be brought within one year of the date of discharge or it is time-barred.  Mont. Code Ann. § 39-2-911(1).   In Montana, a discharge is defined as the "termination of employment".  Mont. Code Ann. § 39-2-903(2).  The termination of employment is "a complete severance of the relationship of employer and employee by a positive act on the part of either or both".  Redfern v. Montana Muffler (1995), 271 Mont. 333, 336, 896 P.2d 455, 456, quoting Allison v. Jumping Horse Ranch, Inc. (1992), 255 Mont. 410, 412, 843 P.2d 753, 755.

In Allison v. Jumping Horse Ranch, Inc. (1992), 255 Mont. 410, 414, 843 P.2d 753, 756, the Court held that the statute of limitations begins to run when all of the elements of the cause of action – duty, breach, causation and damages – are in existence.  It further held that, under the WDEA, damages first occur when "the

employee is no longer earning compensation from the employer, which under the Act is lost wages and fringe benefits . . ." Id.

In Redfern, the court held that a complete severance of the employment relationship occurs at the end of the employee's shift on the date after which the employee is no longer earning compensation from the employer. Redfern, 271 Mont. at 336, 869 P.2d at 457. The court held that Redfern's claim under the WDEA was barred by the statute of limitations where he filed that claim one year and five days after the date on which he ceased earning compensation. Id. Redfern argued that the date on which he ceased receiving compensation had to be extended by five days, because he got paid for five days of vacation pay at the end of his employment. The Court held this argument was "totally without merit", since the vacation pay was not compensation earned after the date of termination. Id.

Thompson filed his complaint on February 25, 2009. Thus the critical question is whether there was a "complete severance" of his employment as of that date. In response to Defendants' first Motion for Summary Judgment, Thompson avoided summary judgment by claiming that he continued to work and receive compensation until the end of February. As a result of discovery, it is undisputed that Thompson's last pay was for the pay period ending January 31, 2008.

Thompson routinely submitted time records to Defendants' accountants, which records were used to process his paychecks. SUF ¶ 19. The last day for which he submitted any time record was January 31, 2008. SUF ¶ 19. He submitted no time record for any time in February of 2008 and he concedes he did not go to the CW Bar Ranch in February 2008. SUF ¶¶ 18, 20.

Not surprisingly, the last day for which Thompson received any pay was January 31, 2008. SUF ¶ 15, 17. Thompson admits that his last check (deposited to his bank account on February 4, 2008) was for the pay period "01/18/2008 – 01/31/2008". SUF ¶ 15. He also received a "Closing Bonus" of $6,250.00 at that time. SUF ¶ 15. [4]

Finally, it is undisputed that the pay Thompson received on February 4, 2008 (for the pay period ending January 31, 2008 and his closing bonus) is all of the compensation Thompson received from Defendants for the entire year of 2008. SUF ¶ 16. Thompson's 2008 W-2 shows that the year-to-date pay reflected on Thompson's February 4, 2008 pay stub is all the pay he received from Defendants for the entire year of 2008. SUF ¶ 16. Thus, Thompson did not receive any pay for any work after he got the February 4, 2008 deposit.

---

[4] This Closing Bonus was addressed in several emails between Susan Coulter and her accountants in which she makes clear that the bonus was a "thank you" or "goodbye" gift in the nature of a severance payment. SUF ¶¶ 9-14.

Under Allison and Redfern, a claim under the WDEA accrues and the statute of limitations begins to run when an employee stops receiving pay for performing work. It is at that point that all elements of a claim, including damages, are present. It is undisputed that Thompson stopped submitting time records to receive pay and stopped receiving pay as of January 31, 2008. As a result, his claim was time-barred prior to February 25, 2009, and must be dismissed.

### 2. Thompson Cannot Avoid Summary Judgment by Bare, Unsupported Allegations that He was Employed Through the End of February 2008.

In response to Defendants' first Motion for Summary Judgment, before discovery was completed, Thompson cited the Court to several emails, and claimed they are evidence that he was still employed by Defendants through the end of February 2008. In light of the evidence learned in discovery, these claims do not preclude summary judgment.

First, all of the "ranch" work Thompson claims to have done from his home in Bozeman was done before February 24, 2008, the key date for statute of limitations purposes. With the exception on a single document (discussed below), all of the documents attached to Thompson's Affidavit (Docket # 17) relate to activities done on or before February 20, 2008. See Exhibits 13-20.

Moreover, these documents do not reflect actual work being performed by Thompson. Four of the documents reflect Thompson's submission of receipts for which he wanted to be reimbursed. (Exhibits 13, 17, 18, 19). Two of the documents relate to a receipt Thompson found which reflects a September 20, 2007 donation (Exhibits 14 and 15). One email, dated February 13, 2008, shows Thompson forwarding comments of a heating contractor in response to an email Thompson sent the contractor on January 21, 2008. (Exhibit 16). Finally, one email is a February 20, 2008 inquiry from CW Bar Ranch's accountant as to the location of a ranch worker (Exhibit 20). This is the same accountant to whom Thompson said on January 31, 2008, "It has been a great pleasure working with you". SUF ¶ 19.

None of these matters demonstrate that Thompson was doing any work for Defendants. None occurred after February 24, 2008. None would be an uncommon exchange between a former employee and his employer. Most significantly, none of these documents undermine Thompson's admission that he stopped receiving pay for work as of January 31, 2008.

In fact, the only document after February 20, 2008 reflecting a communication between Thompson and Defendants is a February 29, 2008 email about building an outhouse at the ranch which was sent to "durfee@mtintouch.net"

(Thompson's replacement) and to Thompson at his ranch email address. Exhibit 21 to Thompson Affidavit. Thompson admitted in his deposition that although he had talked to Durfee about the outhouse, he (Thompson) was not going to build it and did not work on it. Thompson Depo., p. 196, line 5 to p. 197, line 6. This email does not reflect that Thompson did any work for the defendants after January 31, 2008 or that he received pay for any work.

Finally, during the course of discovery, Plaintiff produced his file relating to his unemployment compensation claim. Thompson completed an on-line application to seek unemployment compensation from the Unemployment Division of the Montana Department of Labor & Industry. The Notice of that claim generated by Thompson's application and sent to Defendants contained the statement, "The claimant states they were employed with your firm for 07/15/2004 to 2/20/2008 and separated from employment because of a voluntary quit or discharge". SUF ¶ 21. Thompson later completed a Claimant's Separation Statement in connection with his unemployment compensation claim, where he had to answer numerous questions. That statement also stated that his "End Date" was 02/20/2008. SUF ¶ 22. [5]

---

[5] When questioned about this date, Thompson speculated that the "02" (meaning February) must be in error, and maybe it should have said "03" (indicating March). SUF ¶ 23.

As discussed above, Thompson's last date of employment was in fact January 31, 2008. But even Thompson represented that his employment with Defendants ended before February 24, 2008 when he was seeking unemployment compensation payments.

In the face of the undisputed evidence that Thompson's employment ended on January 31, 2008, Thompson's February 2008 communications with Defendants do not create a fact issue concerning whether he was still employed as of February 24, 2008. Thompson failed to file his claim within the one-year statute of limitations and that claim is barred by the statute of limitations.

## V. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the remaining claims in Plaintiffs' Amended Complaint with prejudice.

DATED this 17th day of March, 2011.

CRIST, KROGH & NORD, LLC

By:    /s/ John G. Crist
John G. Crist
Attorneys for Defendants

**Certificate of Compliance Pursuant to Local Rule 7.1(d)(2)**

**for Case Number CV-10-27-BLG-RFC**

I certify that pursuant to Local Rule 7.1(d)(2), Defendants' Memorandum in Support of Second Motion for Summary Judgment, is proportionately spaced, has a typeface of 14 points or more and contains 4099 words.

DATED this 17th day of March, 2011.

CRIST, KROGH & NORD, LLC

By:    /s/ John G. Crist
        John G. Crist

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of March, 2011, a copy of the foregoing **Defendants' Memorandum in Support of Second Motion for Summary Judgment** was served on the following interested parties, by the means indicated:

| | |
|---|---|
| __1, 2__ | CM/ECF |
| _____ | Hand-Delivery |
| _____ | U.S. Mail |
| _____ | Overnight Delivery Service |
| _____ | Facsimile |
| _____ | Email |

1. Clerk, U.S. District Court

2. Douglas W. Marshall
   Marshall Law Firm, P.C.
   108 South Church Avenue
   Bozeman, MT 59715

CRIST, KROGH & NORD, LLC

By:   /s/ John G. Crist
        John G. Crist
   Attorneys for Defendants